Approved: _____
ANDREW DeFILIPIS/NOAH SOLOWIEJCZYK
Assistant United States Attorneys

Before:    HONORABLE FRANK MAAS
           United States Magistrate Judge
           Southern District of New York

**15 MAG 3199**

- - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA            :    **SEALED COMPLAINT**

                                    :    Violation of 21 U.S.C.
         - v. -                     :    §§ 963, 846

                                    :
MELVIN CASADO,                      :    COUNTY OF OFFENSE:
     a/k/a "USA,"                   :    BRONX

                                    :
                    Defendant.      :

- - - - - - - - - - - - - - - - - - X

SOUTHERN DISTRICT OF NEW YORK, ss.:

MICHAEL O'NEILL, being duly sworn, deposes and says that he is Special Agent with Immigration and Customs Enforcement, Homeland Security Investigations ("HSI"), and charges as follows:

COUNT ONE
(Conspiracy to Import Narcotics into the United States)

1. From at least in or about October 2014, up to and including at least in or about September 2015, in the Southern District of New York and elsewhere, MELVIN CASADO, a/k/a "USA," the defendant, and others known and unknown, intentionally and knowingly did combine, conspire, confederate, and agree together and with each other to violate the narcotics laws of the United States.

2. It was a part and object of the conspiracy that MELVIN CASADO, a/k/a "USA," the defendant, and others known and unknown, would and did import into the United States and into the customs territory of the United States from a place outside thereof a controlled substance, in violation of 21 U.S.C. §§ 952(a) and 960(a)(1).

3.     It was further a part and object of the conspiracy that MELVIN CASADO, a/k/a "USA," the defendant, and others known and unknown, would and did manufacture and distribute a controlled substance, knowing and intending that such substance would be unlawfully imported into the United States and into waters within a distance of twelve miles of the coast of the United States, in violation of 21 U.S.C. §§ 959 and 960(a)(3).

4.     The controlled substances that MELVIN CASADO, a/k/a "USA," the defendant, conspired to: (i) import into the United States and into the customs territory of the United States from a place outside thereof; and (ii) manufacture and distribute, knowing and intending that they would be unlawfully imported into the United States and into waters within a distance of twelve miles of the coast of the United States, were (i) five kilograms and more of mixtures and substances containing a detectable amount of cocaine, in violation of 21 U.S.C. § 960(b)(1)(B), and (ii) one kilogram and more of mixtures and substances containing a detectable amount of heroin, in violation of 21 U.S.C. § 960(b)(1)(A).

(Title 21, United States Code, Section 963.)

COUNT TWO
(Conspiracy to Distribute Narcotics)

5.     From at least in or about October 2014, up to and including at least in or about September 2015, in the Southern District of New York and elsewhere, MELVIN CASADO, a/k/a "USA," the defendant, and others known and unknown, intentionally and knowingly did combine, conspire, confederate, and agree together and with each other to violate the narcotics laws of the United States.

6.     It was a part and an object of the conspiracy that MELVIN CASADO, a/k/a "USA," the defendant, and others known and unknown, would and did distribute and possess with intent to distribute a controlled substance in violation of 21 U.S.C. § 841(a)(1).

7.     The controlled substances that MELVIN CASADO, a/k/a "USA," the defendant, conspired to distribute and possess with intent to distribute were (i) five kilograms and more of mixtures and substances containing a detectable amount of cocaine, in violation of 21 U.S.C. § 841(b)(1)(A), and (ii) one kilogram and more of mixtures and substances containing a

2

detectable amount of heroin, in violation of 21 U.S.C. § 841(b)(1)(A).

(Title 21, United States Code, Section 846.)

The bases for my knowledge and the foregoing charge are, in part, as follows:

8. I am a Special Agent with HSI. I have been personally involved in the investigation of this matter. This Affidavit is based upon my personal participation in the investigation, my examination of reports and records, and my conversations with other law enforcement agents and other individuals. Because this Affidavit is being submitted for the limited purpose of demonstrating probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

## INVESTIGATION BACKGROUND

9. Since in or about October 2014, HSI and the Drug Enforcement Administration ("DEA") have been conducting an investigation of a drug trafficking organization (the "DTO") that is believed to rely on individuals who are employed at airports inside and outside of the United States to covertly smuggle narcotics into the United States via commercial airplanes. Specifically, the DTO is believed to rely on employees at airports outside of the United States (including in the Dominican Republic, among other places) to place narcotics on flights destined for the United States, which narcotics are subsequently intercepted and removed by one or more employees at airports in the United States, including at John F. Kennedy International Airport ("JFK Airport").

10. Based on my review of New York State Department of Motor Vehicle records, I have learned that MELVIN CASADO, a/k/a "USA," the defendant, is a registered livery vehicle driver, and a white Toyota Avalon livery vehicle ("Vehicle-1") is registered in CASADO's name.

11. On multiple occasions in or about 2014, other law enforcement agents and I conducted surveillance of MELVIN CASADO, a/k/a "USA," the defendant, driving Vehicle-1 with a

passenger who is a co-conspirator of CASADO not charged as a defendant herein ("CC-1").

12. On or about September 1, 2015, a grand jury in the Southern District of New York returned a sealed Indictment charging CC-1 with narcotics offenses in connection with the conspiracy described herein. Specifically, and as described in further detail below, CC-1, who is located in the United States, is believed to coordinate activities with one or more corrupt airport workers who assist the DTO's efforts to conceal and smuggle narcotics via commercial airplanes.

13. Based on my review of toll records pertaining to cellphone known to have been used by CC-1 (the "CC-1 Phone"), I have also learned that CC-1 has used the CC-1 Phone to communicate with a particular phone number ("Phone Number-1").

14. Based on my review of commercial databases, toll records, and public information obtained from social media, among other sources, I believe that, at the time of the above-referenced communications, Phone Number-1 was used by another co-conspirator of CASADO not charged as a defendant herein ("CC-2").

15. Moreover, based on information obtained from security personnel at JFK Airport, I have learned that CC-2 is employed by a company that provides catering services to airplanes at JFK Airport ("Company-1"). Based on my communications with JFK Airport personnel, I have also learned that employees of Company-1 transport food onto and off of commercial airplanes prior to their departure from JFK Airport.

16. Moreover, and as described in further detail below, other law enforcement agents and I believe that CC-2 has used his position at Company-1 to assist the DTO's efforts to smuggle narcotics into the United States by removing the narcotics from spaces within commercial airplanes arriving at JFK Airport from the Dominican Republic.

### SEIZURES OF NARCOTICS FROM COMMERCIAL AIRPLANES AT JFK AIRPORT

17. Based on my review of reports prepared by law enforcement and customs personnel working at JFK Airport, I have learned that on four separate occasions in or about March 2015, April 2015, and May 2015, Customs and Border Protection ("CBP") officers located and seized narcotics that had been placed within the lavatories of commercial airplanes arriving at JFK

4

Airport from the Dominican Republic. Specifically, I have learned, in substance and in part, the following:

   a. On or about March 27, 2015, CBP officers conducted an inspection of a commercial aircraft arriving at JFK Airport from Punta Cana, Dominican Republic, and recovered approximately five kilograms of a substance later confirmed through a field test to be cocaine from behind a panel located within a lavatory of the plane.

   b. On or about April 8, 2015, CBP Officers conducted an inspection of a commercial aircraft arriving at JFK Airport from Santo Domingo, Dominican Republic, and recovered approximately 3.7 kilograms of a substance later confirmed through a field test to be cocaine from behind a panel located within a lavatory of the plane.

   c. On or about May 8, 2015, CBP Officers conducted an inspection of a commercial aircraft arriving at JFK Airport from Santo Domingo, Dominican Republic, and recovered approximately five kilograms of a substance later determined through a field test to be heroin from behind a panel located within a lavatory of the plane.

   d. On or about May 10, 2015, CBP Officers conducted an inspection of a commercial aircraft arriving at JFK Airport from Santo Domingo, Dominican Republic and recovered approximately two kilograms of a substance later determined through a field test to be heroin, and three kilograms of a substance later determined through a field test to be cocaine, from behind a panel located within a lavatory of the plane.

  18. Based on my conversations with CBP personnel at JFK Airport and airline personnel, I have also learned that the airline that operates each of the aforementioned airplanes had a catering service contract with Company-1 at the time of the aforementioned seizures. Moreover, I have learned that shortly prior to at least one of the aforementioned seizures, CC-2, the aforementioned employee of Company-1, was observed by law enforcement personnel in the vicinity of the aircraft from which narcotics were subsequently seized.

### INTERCEPTED COMMUNICATIONS REGARDING NARCOTICS SEIZURES

  19. On or about May 6, 2015, June 6, 2015, and August 25, 2015, the Honorable Claire C. Checci, United States District Judge for the District of New Jersey, issued orders (the

"Interception Orders") authorizing the interception of wire and electronic communications over cellular phones believed to be used by CC-1 (collectively, the "Target Cellphones"). Based on my review of draft translations of communications obtained pursuant to the Interception Orders, I have learned that on multiple occasions in or about 2015, MELVIN CASADO, the defendant, CC-1, and others known and unknown, engaged in communications that I believe, based on my training and experience, related to their efforts to smuggle narcotics into the United States, and, in particular, the aforementioned seizures of narcotics.

20. For example, based on my review of draft translations of communications intercepted pursuant to the Interception Orders, I have learned, in substance and in part, the following:

### May 9, 2015 Communications

a. On or about May 9, 2015—one day after the aforementioned narcotics seizure occurring on May 8, 2015 and one day prior to the seizure occurring on or about May 10, 2015——an individual later identified as MELVIN CASADO[1], the defendant, using a BlackBerry with a particular BlackBerry personal identification number[2] (the "CASADO PIN"), exchanged BlackBerry Messenger communications with CC-1, using one of the Target Cellphones. During the aforementioned exchange, CC-1 sent a message to CASADO that stated, in sum and substance, "My brother another package got fuck[ed] my God."

b. Thereafter, CASADO sent CC-1 a BlackBerry voice note[3] in which CASADO stated, in sum and substance, "Don't

---

[1] The process by which CASADO was identified is described in Paragraphs 21 and 22 below.

[2] I know from my training and experience that each BlackBerry device is assigned a BlackBerry Personal Identification Number ("PIN"), a hexadecimal, alpha-numeric identifier which is hard-coded and permanently assigned to a particular BlackBerry device. The PIN identifies the device to BlackBerry's proprietary communication network.

[3] Based on my training and experience, I know that a voice note is a recorded voice communication that can be created using the microphone on a BlackBerry device sent over the BlackBerry Messenger network.

6

joke around, tell me what happened," to which CC-1 then replied in a voice note, "My brother I don't know what happened but it got lost again. I don't know maybe a son of a bitch is leaking. . . It arrived at 8:30 or you know before the old man was arriving all of that time[.]"

        c.    Thereafter, CASADO sent another voice note to CC-1 in which CASADO stated, in substance and in part, "Man, when the one on foot checked before getting off, was it there or was it not there. . . [W]e have to make sure that they are putting it there for real because there is something there that doesn't add up[.]"

        d.    Based on my training and experience and my involvement in this investigation, including my review of prior and subsequent intercepts, I believe that during the above-referenced exchange, CASADO and CC-1 were discussing the fact that narcotics that they had attempted to smuggle into the United States via commercial airplane on or about May 8, 2015 had not been received in New York as planned. Specifically, I believe that CC-1 indicated that, after prior incidents in which the narcotics were not received (which I believe was a result of the aforementioned seizures occurring in March and April of 2015), an additional package containing narcotics was also not received by the DTO in New York ("another package got fuck[ed]").

        e.    Moreover, I believe that CASADO asked CC-1 to explain what happened, to which CC-1 replied, in substance and in part, that one of their co-conspirators might have told law enforcement authorities about the narcotics ("maybe a son of a bitch is leaking"). I further believe that CC-1 indicated that CC-2 had not arrived on the aircraft by the time the narcotics were gone ("before the old man[4] was arriving"). Moreover, I believe that CASADO asked CC-1 whether another person who had traveled on the flight to ensure that the narcotics would arrive in New York had confirmed that the narcotics were still in the lavatory before disembarking from the plane ("the one on foot checked before getting off, was it there or it was not there[?]"). Finally, I believe that CASADO indicated that CASADO and CC-1 would have to make sure that the people responsible for loading the narcotics onto commercial planes in the Dominican Republic were in fact placing the

---

[4] Based on, among other things, my review of communications obtained pursuant to the Interception Orders, I know that CC-2, the above-referenced airport employee, is referred to by a nickname that means "old man" in Spanish.

narcotics on board ("make sure that they are putting it there for real").

### May 11, 2015 Communications

f.  On or about May 11, 2015, CASADO, using the CASADO PIN, sent a BlackBerry message to CC-1 that stated, in sum and substance, "I just met up with the old man." Thereafter, CC-1 sent BlackBerry messages to CASADO that stated, "Did he leave. . . the old man[?]". CASADO then replied, "Yes, . . . Listen, he is far away."

g.  Thereafter, CC-1 sent BlackBerry messages to CASADO stating, in sum and substance, "So you can tell him something because I don't want to call him. . . Call him, so he can get/obtain something else so I can reach him."

h.  On or about May 11, 2015, CASADO also sent a BlackBerry message to CC-1 stating, in substance and in part, "I spoke to the old man and he told me he is going to come over to this side so we can get together.

i.  Based on my training and experience, and my involvement in this investigation, including my review of prior and subsequent intercepts, I believe that during the above-referenced exchange, CASADO and CC-1 were discussing their efforts to communicate with CC-2 ("the old man"), a corrupt worker at JFK Airport, regarding the aforementioned seizures of narcotics. Specifically, I believe that CASADO indicated that CASADO had just met with CC-2 ("I just met up with the old man"), and that CC-1 asked whether CC-2 was still present with CASADO ("Did he leave"). I believe that CASADO then replied that CC-1 had left ("[H]he is far away."). I further believe that CC-1 then asked CASADO to tell CC-2 to obtain a new telephone number ("Call him, so he can get/obtain something else so I can reach him"), which I believe CC-1 requested in order to ensure that CC-1's communications with CC-2 were not monitored by law enforcement personnel. I also believe that CC-1 indicated that CC-1 did not want to call CC-2 ("I don't want to call him"), which I believe also reflected CC-1's efforts to ensure that his communications would not be monitored by law enforcement personnel. Finally, I believe that CASADO indicated

8

to CC-1 that CC-2 would come over from Brooklyn, where CC-2 resides, to the Bronx and/or Manhattan.[5]

### May 12, 2015 Communications

j.  On or about May 12, 2015, CASADO, using the CASADO PIN, sent a BlackBerry message to CC-1 stating, in sum and substance, "Yes brother it was them that found the packages. . . It came out in the news," to which CC-1 replied, "But that is my salvation . . . thank god they did not grab anyone."

k.  Approximately one minute later, CASADO sent to CC-1 multiple BlackBerry messages containing screenshots of an online news article entitled, "Drug-detection Dog Finds 24 Pounds of Cocaine, Heroin at JFK." Based on my review of publicly-available information, I have learned that on or about May 11, 2015, the New York Daily News published an article on its website concerning the aforementioned seizures of narcotics that occurred on or about May 8, 2015 and May 10, 2015, and that the article is the same one that appeared in the screenshots sent by CASADO to CC-1 on or about May 12, 2015.

l.  On or about May 12, 2015, CASADO also sent additional BlackBerry messages to CC-1 stating, in substance and in part, "[D]id you take care of the it with the ones that were a bit uncomfortable[?]. . . Do they understand what happened[?]," to which CC-1 replied, "Of course bro. . . I only have 3 thousand Dominican pesos, they took everything."

m.  Thereafter, CASADO sent CC-1 a BlackBerry message stating, "At least they are clear as to what happened. . . that's a relief."

n.  Based on my training and experience, and my involvement in this investigation, including my review of prior and subsequent intercepts, I believe that during the above-referenced exchange, CASADO and CC-1 discussed the fact that the narcotics they had attempted to smuggle into the United States were the subject of recent news reporting ("It came out in the news."). Specifically, I believe that CC-1 expressed relief that a newspaper was reporting on the seizures ("But that is my salvation"). I further believe that CASADO asked CC-1 whether CC-1 had attempted to ease the concerns of their narcotics

---

[5] Based on my review of commercial databases and my knowledge of physical surveillance conducted by law enforcement personnel, among other sources, I have learned that CASADO resides in the Bronx and CC-1 resides in Manhattan.

9

suppliers located in the Dominican Republic ("Did you take care of it with the ones that were a bit uncomfortable[?]"). Moreover, I believe that CC-1 replied that CC-1 had spoken to the suppliers about the seizures, and that CC-1 had previously given the suppliers money as down payment for the narcotics ("Of course. . . I only have 3 thousand Dominican pesos. . . .They took everything"). Furthermore, I believe that CASADO expressed relief that CC-1 had spoken with the suppliers and explained what happened ("At least they are clear what happened. . . that's a relief.")

    o. Based on my training and experience, and my involvement in this investigation, including my review of prior and subsequent intercepts, I believe that both CC-1 and CASADO expressed relief at the aforementioned news article because they believed that the suppliers of the narcotics ("the ones that were a bit uncomfortable") initially suspected that the narcotics had been stolen by CASADO and CC-1. Thus, I believe CASADO and CC-1 took comfort that the suppliers were now aware that the narcotics had in fact been seized by law enforcement and therefore would not retaliate against CASADO and CC-1 ("At least they are clear as to what happened.").

### IDENTIFICATION OF CASADO

    21. On or about May 13, 2015, the Honorable Andrew J. Peck, United States Magistrate Judge for the Southern District of New York, issued an order (the "May 13 Order") authorizing the collection of geolocation information pertaining to the cellular phone number associated with the CASADO PIN in subscriber records obtained from BlackBerry, Inc. (the "CASADO PHONE").

    22. On or about May 27, 2015, other law enforcement agents and I used geolocation information obtained pursuant to the May 13 Order to locate the user of the CASADO PHONE. Specifically, other agents and I located and conducted covert physical surveillance of a male in the Bronx, New York whom we believed, based on geolocation data, to be the user of the CASADO PHONE. During the physical surveillance, another agent ("Agent-1") observed the male enter a white Toyota Avalon resembling Vehicle-1 and drive the vehicle in the vicinity of the Bronx, New York. Thereafter, Agent-1 reviewed a photograph of MELVIN CASADO, the defendant, obtained from a law enforcement database. Based on Agent-1's review of the photograph, Agent-1 concluded that the individual observed in the surveillance conducted on or about May 27, 2015 and CASADO are one and the same person.

10

WHEREFORE, the deponent respectfully requests that MELVIN CASADO, a/k/a "USA," the defendant, be imprisoned, or bailed, as the case may be.

_____
MICHAEL O'NEILL
Special Agent
Homeland Security Investigations

Sworn to before me this
8th day of September, 2015.

_____
THE HONORABLE FRANK MAAS
United States Magistrate Judge
Southern District of New York